UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SHARON DENISE OWENS, | ) |
| Plaintiff, | ) ) |
| v. | ) NO. 3:14-cv-00107 ) CHIEF JUDGE CRENSHAW ) |
| NANCY BERRYHILL, Acting Commissioner of Social Security, | ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM OF OPINION

Pending before the Court is Sharon Denise Owens' ("Owens") Motion for Judgment on the Administrative Record ("Motion") (Doc. No. 12), filed with a Memorandum in Support (Doc. No. 12-1). Defendant Commissioner of Social Security ("Commissioner") filed a Response in Opposition to Owens's Motion (Docket No. 13), to which Owens filed a Reply (Doc. No. 16). Upon consideration of the parties' filings and the transcript of the administrative record (Doc. No. 10),[1] and for the reasons given below, the Court will **DENY** the Motion.

### I. Introduction

On October 13, 2010, Owens filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Act, alleging a disability onset of October 13, 2010 (the "alleged onset date"). (A.R. 101–05.) Owens' claim was denied at the initial and reconsideration stages of state agency review. (A.R. 54, 65.) Owens subsequently requested *de novo* review of his case by an Administrative Law Judge ("ALJ"). (A.R. 68.) The ALJ heard the case on December 5, 2012, when Owens

---

[1] Referenced hereinafter by page number(s) following the abbreviation "A.R."

1

appeared, was represented by an attorney, and gave testimony. (A.R. 30.) Testimony was also received from an impartial vocational expert. (Id.) At the conclusion of the hearing, the matter was taken under advisement until January 25, 2013, when the ALJ issued a written decision finding Owens not disabled. (A.R. 25.) That decision contains the following enumerated findings:

1. Owens has not engaged in substantial gainful activity since the alleged onset date (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*).

2. Owens has the following severe impairments: bilateral carpal tunnel syndrome; lumbar spine disorder; cervical spine disorder; asthma; partial hearing loss; major depressive disorder; panic disorder without agoraphobia; and obesity (20 C.F.R. 416.920(c)).

3. Owens does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926).

4. Owens has the residual functional capacity ("RFC") to perform light work as defined by 20 C.F.R. 416.967(b) except that she needs to avoid concentrated exposure to pulmonary irritants; can lift/carry up to 20 pounds occasionally and 10 pounds frequently; she can occasionally climb ramps, ladders and scaffolds; no more than frequently perform postural activities; push/pull no more than frequently with the bilateral lower extremities; no more than occasionally handle with the bilateral upper extremities; no more than frequently reach with the bilateral upper extremities; can perform one- to three-step tasks; she is able to stand and walk for up to six hours in an eight-hour workday; she can sit for up to six hours in an eight-hour workday; she can maintain concentration, persistence, and/or pace for two-hour periods during the workday, interact appropriately in the workplace, and adapt to infrequent changes in the same.

5. Owens has no past relevant work (20 C.F.R. 416.965).

6. Owens was born on December 7, 1967, and was 42 years old at the alleged onset date, which is defined as a younger individual aged 18-49 (20 C.F.R. 416.963).

7. Owens has a limited education and is able to communicate in English (20 C.F.R. 416.964).

8. Transferability of job skills is not an issue in this case because Owens has no past relevant work (20 C.F.R. 416.968).

9. Considering Owens's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform (20 C.F.R. 416.969, and 416.969(a)).

10. Owens has not been under a disability within the meaning of the Social Security Act from the alleged onset date through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(A.R. 12–25.) Owens filed a timely appeal with the Appeals Council which upheld the decision on November 14, 2013. (A.R. 5, 1.) This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g).

## II. Review of Record

The Court adopts the summary of Owens's medical records from the ALJ's decision. (A.R. 17–23.)

## III. Conclusions of Law

### A. Standard of Review

This Court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. Miller v. Comm'r of Soc. Sec., 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." Brooks v. Comm'r of Soc. Sec., 531 F. App'x 636, 641 (6th Cir. 2013) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. See Hernandez v. Comm'r of Soc. Sec., 644 F. App'x 468, 473 (6th Cir. 2016 (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this Court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012)

(quoting Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." Miller, 811 F.3d at 833 (quoting Gentry v. Comm'r of Soc. Sec., 741 F.3d 708, 722 (6th Cir. 2014)).

### B. Five-Step Inquiry

The claimant bears the ultimate burden of establishing entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). The SSA considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1. A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. A claimant who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart B of the Regulations. Claimants with lesser impairments proceed to step four.

4. A claimant who can perform work that he has done in the past will not be found to be disabled.

5. If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Parks v. Soc. Sec. Admin., 413 F. App'x 856, 862 (6th Cir. 2011) (citing Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functioning capacity[.]'" Kepke v. Comm'r of Soc. Sec., 636 F. App'x 625, 628 (6th Cir. 2016) (quoting Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004)).

The SSA can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. See Anderson v. Comm'r of Soc. Sec., 406 F. App'x 32, 35 (6th Cir. 2010); Wright v. Massanari, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. Wright, 321 F.3d at 615–16; see Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's prima facie case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. Anderson, 406 F. App'x at 35; see Wright, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity ("RFC") at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical,

5

exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Glenn v. Comm'r of Soc. Sec., 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C. Weighing Medical Source Evidence

The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence. Cole v. Astrue, 661 F.3d 931, 937 (6th Cir. 2011). The significant deference accorded to the Commissioner's decision is conditioned on the ALJ's adherence to these governing standards. In Gentry v. Commissioner of Social Security, the Sixth Circuit re-stated the responsibilities of the ALJ in assessing medical evidence in the record in light of the treating source rule:

> Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings. 20 C.F.R. § 404.1520(a)(3); 20 C.F.R. § 404.1512(b); 20 C.F.R. § 404.1513. The second is known as the "treating physician rule," see Rogers, 486 F.3d at 242, requiring the ALJ to give controlling weight to a treating physician's opinion as to the nature and severity of the claimant's condition as long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2) (language moved to 20 C.F.R. § 404.1527(c)(2) on March 26, 2012). The premise of the rule is that treating physicians have the best detailed and longitudinal perspective on a claimant's condition and impairments and this perspective "cannot be obtained from objective medical findings alone." 20 C.F.R. § 416.927(d)(2) (language moved to 20 C.F.R. § 416.927(c)(2) on March 26, 2012). Even when not controlling, however, the ALJ must consider certain factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the physician; and any other relevant factors. Rogers, 486 F.3d at 242. In all cases, the treating physician's opinion is entitled to great deference even if not controlling. Id. The failure to comply with the agency's rules warrants a remand unless it is harmless error. See Wilson, 378 F.3d at 545–46.

741 F.3d 708, 723 (6th Cir. 2014).

The Sixth Circuit has also made clear that an ALJ may not determine the RFC by failing to address portions of the relevant medical record, or by selectively parsing that record—i.e., "cherry-picking" it—to avoid analyzing all the relevant evidence. Id. at 724 (citing Minor v. Comm'r of Soc. Sec., 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); Germany-Johnson v. Comm'r of Soc. Sec., 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports")). This is particularly so when the evidence ignored is from a treating physician. Ignoring medical evidence from a treating source in fashioning the RFC, without a proper analysis of why such action is taken, cannot be harmless error because it "undermines [the ALJ's] decision" to overlook evidence that could have potentially supported a more restrictive RFC or even a finding of disability. Gentry, 741 F.3d at 729 (citations omitted); Grubbs v. Comm'r of Soc. Sec., No. 12–14621, 2014 WL 1304716, at *2 (E.D. Mich. Mar. 31, 2014) ("The absence of a review of treatment records from a treating source and the lack of analysis of such made it impossible for the ALJ to properly assess whether the Plaintiff was disabled and/or whether Plaintiff had the residual functional capacity to do any work.").

   D. **Owens' Statement of Errors**

   1. **The ALJ Failed to Properly Consider the Opinion of Consultative Medical Examiner Dr. Davis and Resolve Significant Inconsistencies Between This Opinion and Her Decision.**

The ALJ gave "no weight" to the opinion of consultative medical examiner Dr. Bruce Davis that Owens could perform a significantly reduced range of light work that included never balancing and sitting for no more than one hour at a time, because it was "internally inconsistent" with examination findings that Owens ambulated without an assistive device, including

7

performance of a heel, toe, and tandem walk across the exam room. (A.R. 23.) The ALJ also found that Dr. Davis's explanation of "slow gait and gate maneuvers" failed to translate into Owens' inability to sit for more than an hour or balance. (Id.) Owens claims that this was erroneous. (Doc. No. 12-1, at 12.) First, she opines that it is "reasonable that Dr. Davis restrict[ed] Ms. Owens from any balancing because in the Dictionary of Occupation Titles ("DOT"), Selected Characteristics of Occupations ("SCO"), Appendix C, at 3, defines it as "[m]aintaining body equilibrium to prevent falling when walking, standing, crouching, or running on narrow, slippery, or erratically moving surfaces; or maintaining body equilibrium when performing gymnastic feats." (Id. at 12–13.) Second, Owens claims that Dr. Davis' explanation of her sitting restrictions is not inconstant but "just not explained sufficiently for the ALJ"'s satisfaction." (Id. at 13.) Third, Owens asserts that "the ALJ failed to . . . address any of the other aspects of his decision, such as his supported limitations on carrying, standing, walking, reaching, handling, fingering, feeling, and pushing/pulling" and relied on the opinions of non-examining physicians. (Id. at 13–14.)

Generally, an ALJ must give more weight to the opinion of an examining source than a non-examining source. 20 C.F.R. § 404.1527(c)(1). However, an ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings. 20 C.F.R. § 404.1520(a)(3); 20 C.F.R. § 404.1512(b); 20 C.F.R. § 404.1513. While the ALJ gave greater weight to non-examining sources—specifically, Dr. James Gregory—than she did to Dr. Davis, she explained that this was because "Dr. Gregory's opinion is consistent with the evidence" whereas the limitations identified by Dr. Davis "are unsupported by even his own examination findings." (A.R. 22–23.) The explanation given by Dr. Davis for Owens' inability to balance or sit for more than two hours is more than "not explained sufficiently for the ALJ"'s satisfaction." (Doc No. 12-1, at 13.) It is not explained sufficiently at

8

all. Neither Dr. Davis nor Owens offered any reason why "slow gait and gait maneuvers" would restrict Owens' ability to sit for more than an hour. (A.R. 204; Doc. No. 12-1, at 13.) Similarly, Dr. Davis' balance restrictions are belied by the "objective medical evidence, medical signs, and laboratory findings" in the file and his own examination. 20 C.F.R. § 404.1520(a)(3); 20 C.F.R. § 404.1512(b); 20 C.F.R. § 404.1513. For example, Dr. Davis reported that Owens' chest and lumbar x-rays were normal and that she was able to ambulate without assistance on three different types of gait maneuvers. (A.R. 201–202.) Consequently, the limitations that the ALJ included in the RFC with respect to sitting and balance are explained and do not constitute reversible error.

Owens also claims that the ALJ did not explicitly address Dr. Davis' limitations with respect to Owens' ability to carry, stand, walk, reach, handle, finger, feel, and push/pull. (Doc. No. 12-1, at 13–14.) Dr. Davis imposed greater limitations on Owens than the RFC with respect to these functionalities. (A.R. 204–06.) For example, Dr. Davis opined that Owens could never carry more than 10 pounds and only occasionally carry up to 10 pounds and explained this finding as "bilateral carpal tunnel syndrome with weak grip . . . back injuries with pain, reduced back and leg motions." (A.R. 204.) Whereas Dr. Gregory, to whom the ALJ accorded great weight (A.R. 22), found that Owens could frequently carry up to 10 pounds and occasionally carry up to 20 (A.R. 238). The RFC reflects Dr. Gregory's limitations (A.R. 16), and the ALJ explained that "Dr. Gregory's opinion is consistent with the totality of the evidence, including Dr. Baker's documentation of the claimant's CTS [carpal tunnel syndrome] surgery and recovery . . . imaging revealing no more than moderate abnormalities of the lumbar or cervical spines, and throughout the period in question, relatively unremarkable physical examination findings." (A.R. 22.)

The ALJ referred to Dr. Baker's records (A.R. 17–18), as well as Owens' CTS surgery and recovery (id.), her lumbar and cervical medical records (A.R. 19), and her own statements

concerning her limitations (A.R. 21–22). The ALJ explained that Owens' statements concerning her functional limitations were "not fully credible" because Dr. Baker assessed her with "no difficulty performing activities of daily living[,]" her complaints of pain were inconsistent with physical examination findings (concerning acute distress and elevated blood pressure) that are adversely affected by pain, "imaging failed to conclusively establish any significant abnormalities[,]" Owens reported no functional limitations on multiple dates on which she reported pain of a 10/10, records do not reveal CTS until a year after the protective filing date and show a positive post-operative trajectory after surgery, and records show that Owens was not compliant with treatment instructions. (Id.) While the ALJ did not explicitly link these specific findings to the inconsistencies in Dr. Davis' opinion concerning Owens' ability to carry, stand, walk, reach, handle, finger, feel, and push/pull, she devoted several preceding paragraphs to them prior to explaining that she accorded Dr. Gregory "great weight" (A.R. 22) while according Dr. Davis "no weight" (A.R. 23). As such, the ALJ adequately explained the reasons for the weight conferred and any error was harmless.

**2. The ALJ Failed to Properly Consider the Opinion of Consultative Psychological Examiner Dr. Lambert and Resolve Significant Inconsistencies Between This Opinion and Her Decision.**

The ALJ gave "no weight" to the opinion of consultative psychological examiner Dr. Dorothy Lambert that Owens was markedly limited in most areas of mental work-related functioning, including ability to react to changes, concentration, persistence, and pace. The ALJ explained that Dr. Lambert's opinion was internally inconsistent because she noted that "it is not known if claimant was putting forth her best effort" during the exam and assessed her with a GAF of 55, which is indicative of only moderate functional limitations. (A.R. 23.) Owens claims that the ALJ's reasons for rejecting Dr. Lambert's opinion were "baseless and without merit" because Dr. Lambert saw no signs of malingering, the GAF assigned represents a mix of mild and marked

10

limitation, and the ALJ relied on the opinions of non-examining physicians over Dr. Lambert. (Doc. No. 12-1 at 17.)

Owens correctly notes that "the GAF scale . . . does not have a direct correlation to the severity requirements in our mental disorder listings. (Id. at 16 (citing 65 Fed. Reg. 50746, 50764).) However, the entirety of the ALJ's decision shows that she conferred "no weight" to Dr. Lambert's opinion, not merely because of the Dr. Lambert's "internal inconsistencies" and GAF assessment, but because other examiners' opinions were "consistent with the totality of the evidence." (A.R. 23.) For example, the ALJ referred to Owens medical records concerning mental health issues and treatment in the months leading up to the protective filing date, noting that, while she reported situational depression and providers noted that she appeared "stressed and mildly anxious when discussing her home life[,]" later records did not, suggesting that the issue was "sporadic . . . rather than an ongoing psychiatric state[.]" (A.R. 21.) The ALJ explained that Owens' statements concerning her mental health limitations were "not fully credible" by again describing them as "sporadic" and "situational" and noting the absence of "treatment records concerning her 'nervous problem" and the absence in other medical records of mental health symptoms. (A.R. 22.) The ALJ also explained that she accorded "great weight" to Dr. Victor O'Bryan—who did not examine Owens but reviewed her records and concluded she had only moderate limitations—and, by extension, Dr. Frank Kupstas—who adopted Dr. O'Bryan's opinion—because they were "consistent with the totality of the evidence, which documents no more than moderate mental health symptoms at any time during the period in question, no more than sporadic complaints of depression/anxiety, and no dedicated mental health treatment at any time." (A.R. 23.) While the ALJ did not explicitly link these specific findings to the inconsistencies in Dr. Lambert's findings concerning Owens' mental health limitations, she

11

devoted several preceding paragraphs to them prior to explaining that she accorded Doctors O'Bryan and Kupstas "great weight" while according Dr. Lambert "no weight[.]" (Id.) As such, the ALJ adequately explained the reasons for the weight conferred and any error was harmless.

   3. **At Step Five the ALJ Failed to Consider the Relevant Regulations and Resolve Apparent Inconsistencies Between the Dictionary of Occupational Titles and Vocational Expert Testimony.**

Owens claims that the occupations that the ALJ identified as being available to her—highway flagger, food service hostess and school bus monitor—exceed her RFC and the ALJ failed to address or resolve these inconsistencies. (Doc. No. 12-1, at 18.) Specifically, Owens claims that she was limited to only occasionally handling with the bilateral extremities, but the occupations of flagger and food service hostess require frequent handling, and school bus monitors do not exist in significant numbers in the national economy. (Id.) In the hearing, the ALJ presented the Vocational Expert ("VE") with a hypothetical in which Owens would be limited to occasionally handling with the bilateral extremities and the VE identified the highway flagger and hostess jobs. (A.R. 44–45.) The ALJ followed the hypotheticals by asking the VE if his testimony was consistent with the DOT, to which he replied, "Yes." (A.R. 46.) Owens' attorney did not follow up with questions about any inconsistencies in the DOT. (Id. at 46–47.)

By asking the VE if his testimony was consistent with the DOT, the ALJ "effectively satisfied the Commissioner's burden" at Step Five. Lee v. Comm'r of Soc. Sec., 529 F. App'x. 706, 715 (6th Cir. 2013). Furthermore, "the ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00-4p. This obligation falls to plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT. The fact that plaintiff's counsel did not do so is not grounds for relief." Beinlich v. Comm'r of Soc. Sec., 345 F. App'x. 163, 168 (6th Cir. 2009) (citing Lindlsey v. Comm'r of

Soc. Sec., 560 F.3d. 601, 606 (6th Cir. 2009); Ledford v. Astrue, 3121 F. App'x. 746, 757 (6th Cir. 2008)). As the instant case is analogous to the aforementioned cases, the Court does not find this reversible error.

Likewise, Owens' claim that the school bus monitor position (of which there are 50,000 positions nationally) does not exist in sufficient numbers is without merit. (A.R. 46.) There is no "one special number which is to be the boundary between a 'significant number' and an insignificant number." Taskila v. Comm'r Soc. Sec., 819 F.3d 902, 906 (6th Cir. 2016) (citing Hall v. Bowen, 837 F.2d 272, 275 (6th Cir. 1988). Even assuming that 50,000 school bus monitor positions nationally do not constitute a significant number, the ALJ relied on two other positions, constituting over 112,000 positions nationally. (A.R. 45–46.) The SSA's Program Operations Manual ("POMS") allows an ALJ to "cite fewer than three occupations when it is clear that jobs exist in significant numbers within fewer than three occupation(s)." POMS, § DI 25025-030, Appellate R. 12–2 at 2. Consequently, Plaintiff's argument in this regard is without merit.

### 4. The ALJ Erred by Making Inconsistent Findings Regarding Paragraph B Criteria for Mental Disorders Listings and the RFC.

Owens claims that, although the ALJ found her major depressive disorder and panic disorder without agoraphobia were severe, she erred by failing to include specific limitations in her RFC due to the same. (Doc. No. 12-1, at 19.) The ALJ gave Owens "the benefit of a doubt" and found that she had moderate difficulties in social functioning but could interact appropriately in the workplace. (A.R. 15, 16.) In so doing, the ALJ found that Owens said she spent no time with others, although she reported regularly going to church and no particular problems getting along with friends, most family, neighbors, and authority figures. (A.R. 15.) She only reported problems with her sons due to their legal troubles. (A.R. 15, 21) Moreover, the ALJ noted the absence of treatment records indicating social functioning problems that might affect her work.

13

(A.R. 21–22.) In light of the ALJ's specific reference to Owens' ability to interact with others, in particular supervisors, this RFC does not seem inconsistent.

### 5. The ALJ Erred by Failing to Include Limitations in the RFC Reflecting Owens' Severe Impairment of Partial Hearing.

Owens claims that, although the ALJ found her partial hearing loss severe, she failed to include limitations in the RFC regarding the same. (Doc. No. 12-1, at 20.) Specifically, Owens claims that her hearing loss presents limitations with exposure to noisy environments and hazards and that such conditions would be present in the school bus monitor position the VE identified. (Id.) The ALJ explained that Owens' hearing loss did not factor into the RFC because "[v]iewing the documentary evidence as a whole, it is reasonable to conclude that the claimant could adequately converse with others on a regular basis." (A.R. 21.) The ALJ acknowledged medical records indicating that Owens reported using a hearing aid, hearing tests indicated she needed one, the psychological consultant reported she had to repeat herself, and a medical consultant noted she had "reduced hearing of [a] whisper across [the] exam room." (Id.) However, the ALJ also noted that medical professionals observed she could use a cellphone with her hearing aid, concluded she had no problems communicating, and that "the record says little concerning the claimant's hearing problems." (Id.)

While Owens correctly asserts that her hearing loss is well-documented, she points to no medical records to support her assertion that her hearing loss presents limitations that the ALJ overlooked. (Doc. No. 12-1, at 20.) Where a party fails to cite to the administrative record in support of its argument, it is not the task of the Court to scour the record on that party's behalf. See Markel v. Comm'r of Soc. Sec., No. 13-11196, 2013 WL 5854467, at *3 (E.D. Mich. Oct. 30, 2013) (citing McPherson v. Kelsey, 125 F.3d 989, 995–96 (6th Cir. 1997) (("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation,

are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to ... put flesh on its bones.")  In the absence of any specific citations to support her argument that the ALJ neglected to include limitations related to her hearing loss in the RFC, the Court finds that Owens' claim is without merit.

### 6. New and Material Evidence Warrants Reconsideration.

In addition to seeking a remand and judgment on the administrative record, pursuant to the fourth sentence of 42 U.S.C. § 405(g), Owens also seeks a remand pursuant to the sixth sentence of § 405(g), so that the agency may reconsider its decisions in light of the new and material evidence contained in an April 3, 2013, letter from Dr. Baker, who had been treating Owens for her carpal tunnel syndrome and trigger thumb since September 2011, indicating that she had a new injury and these "issues have prevented Ms. Owens from employment."  (Doc. No. 12-1, at 21.) This letter was submitted after the ALJ issued her decision but included in the record provided to the Appeals Counsel.  (Id.)

Sentence six of § 405(g) allows a remand to consider evidence that was not previously before the ALJ, "but only upon a showing that there is new evidence which is material and that there is good cause for failure to incorporate such evidence in the record in the prior proceeding." The party seeking remand bears the burden of demonstrating newness, materiality, and good cause. Hollon v. Comm'r of Soc. Sec., 447 F.3d 477, 483 (6th Cir. 2006).  Sentence six remand is not a vehicle for the consideration of evidence that a claimant's condition worsened after the hearing.  E.g., Wyatt v. Sec'y of Health & Human Servs., 974 F.2d 680, 685 (6th Cir. 1992). Moreover, the new evidence must be probative of the severity of claimant's symptoms during the period considered by the ALJ; evidence is not material if it shows that the impairments or severity increased after the hearing. E.g., Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 478 (6th Cir. 2003).

Owens claims that this letter is new and material evidence and there was good cause for introducing it after the hearing because it addresses her severe impairments and supports a finding of disability. (Doc. No. 12-1, at 23.) However, it is unclear what the "new injury" is and why Dr. Baker failed to draft such a letter prior to the hearing. (A.R. 401.) As such, Owens failed to meet her burden of showing that such evidence is new. Owens also failed to meet her burden showing that the evidence was material since the letter amounts to a conclusory opinion that Owens cannot work, an opinion "on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case." 20 C.F.R. § 404.1527(d). Moreover, Owens offers no reason why she failed to present this letter earlier, despite her long-standing treatment by Dr. Baker. Accordingly, the Court finds that the evidence is neither new, nor material, nor was there good reason to omit it earlier, and a remand under sentence six of 42 U.S.C. § 405(g) is unwarranted.

## IV.    Recommendation

For the reasons explained above, Owens's Motion for Judgment on the Administrative Record (Doc. No. 12) will be **DENIED**.

An appropriate order will be entered.

_____
WAVERLY CRENSHAW, JR.,
CHIEF UNITED STATES DISTRICT JUDGE